IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

**UNITED STATES OF AMERICA** )
) 
   v. ) CRIMINAL ACTION NO.
)    2:03cr259-MHT
**LEON CARMICHAEL, SR.** ) (WO)

OPINION

**This case, in which defendant Leon Carmichael, Sr. was convicted of conspiring to distribute marijuana and conspiring to commit money laundering, is before the court on Carmichael's motions to stop the sale of certain forfeited property pending resolution of an expected appeal.[1] Based on the argument of counsel and the evidence, including that presented at a hearing on June 12, 2006, the motions will be denied.**

---

    1. **Carmichael's sentencing has been postponed several times and is now scheduled for July 28, 2006, pending resolution of the jury challenge also before the court in this case.**

## I. BACKGROUND

On June 20, 2005, after his conviction and in order to avoid a supplemental trial on the forfeiture allegations in the indictment against him, Carmichael agreed to forfeit the Carmichael Center and 370.93 acres of surrounding land, and to accept a proceeds judgment of one million dollars against him, with the proceeds from the sale of the 370.93 acres to go toward the money judgment. In reaching this settlement with the government, Carmichael was able to protect certain other property, including his family home, from potential forfeiture.

The oral agreement reached between the parties on June 20 was memorialized in several orders entered on August 1 and 15, 2005, for the forfeiture and sale of the property. On August 1, the court entered two orders, one for the proceeds judgment against Carmichael in the amount of one million dollars, and the other for the forfeiture and sale of approximately 370 acres of land to

2

satisfy that judgment.[2] The second order further provides that the government is to return to Carmichael any net proceeds over one million dollars from the sale of the 390.73 acres.[3] On August 15, the court entered another order, this time for forfeiture and sale of the Carmichael Center.[4]

On November 28, 2005, again with the consent of all parties, the court issued an order approving the interlocutory sale of both the center and the 370.93 acres, with the proceeds of the sale to be deposited in the appropriate United States Marshals Service fund pending a further order or resolution of direct appeal of the case.[5]

On March 23, 2006, the Carmichael center was listed for sale at a price of $ 2.5 million, while the 370.93 acres were listed on the same date at a price of

---

2. Doc. Nos. 486 & 487.

3. Doc. No. 487.

4. Doc. No. 503.

5. Doc. No. 606.

3

$ 699,900. On April 27, the list price of the Carmichael Center was adjusted to $ 1.9 million, and the price of the acreage adjusted to $ 669,000. The government has now negotiated contracts to sell the Carmichael Center for $ 1.7 million and the 307.93 acres for $ 500,250.

On May 17, 2006, Carmichael filed a motion to stop sale of the center,[6] and, on May 23, filed a motion to stop sale of the 370.93 acres.[7] These are the motions currently before the court.

## II. DISCUSSION

Carmichael does not challenge the forfeiture of property itself; rather, he contends that the government has breached the settlement agreement by selling the forfeited properties at a price he maintians is below market value. With respect to the center, he also asserts that the government has breached its agreement by

---

6. Doc. No. 690.

7. Doc. No. 694.

its failure to agree to use the sale proceeds to pay all creditors who contributed to the construction of the property, rather than just secured creditors. The court will address the challenges to the sale of the two properties separately.

### A. Sale of the Carmichael Center

#### 1. <u>Sale Price</u>

Carmichael does not assert a basis for standing to challenge the proposed sale of the Carmichael Center other than that, because the proposed sale price is now purportedly lower than the cost of constructing the center, he will suffer financial loss should his conviction ultimately be overturned on appeal. He asserts that he at one time obtained an appraisal valuing the center at over $ 2.5 million dollars, much higher than the government's negotiated sale price of $ 1.7 million.

Once property has been criminally forfeited, as it has been in this case, the defendant loses all legal interest in the property and the government acquires clear title after third-party interests have been adjudicated pursuant to 21 U.S.C. § 853(n). See United States v. Carmichael, ___ F.Supp.2d ___, ___, 2006 WL 1477404 *1-2 (M.D. Ala. 2006) (Thompson, J.) (discussing the conveyance of clear title to the government after adjudication of third-party interests pursuant to 21 U.S.C. 853(n)(7) and Fed. R. Crim. P. 32.2(c)(2)). Moreover, 21 U.S.C. 853(h) permits the court to stay the sale of forfeited property pending resolution of an appeal only upon a showing of irreparable injury, harm or loss to a party other than the defendant.[8]

---

8. 21 U.S.C. 853(h) reads, in relevant part: "Upon application of a person, other than the defendant or a person acting in concert with him or on his behalf, the court may restrain or stay the sale or disposition of the property pending the conclusion of any appeal of the criminal case giving rise to the forfeiture, if the applicant demonstrates that proceeding with the sale or disposition of the property will result in irreparable injury, harm, or loss to him."

Even if Carmichael retains some interest in the property that would give him standing to challenge its sale, the record provides absolutely no factual support for his contention that the Carmichael Center is currently worth $ 2.5 million and that, should he prevail on an appeal of his conviction, he will benefit from a stay of the scheduled sale. It is not disputed that Carmichael's original appraisal, which has not been submitted into evidence, was completed when the center was a functioning entertainment venue. It is equally undisputed that the property continues to deteriorate and lose value as it remains unoccupied.[9]  The most recent

---

9. Carmichael complains that the property would be more valuable today had the government permitted another businessperson to manage the center as an entertainment venue pending sale rather than allowing the property to lie vacant, and had the government not insisted on the removal of various stereo, lighting, and kitchen fixtures not subject to the forfeiture order. This is no doubt true, but the fact remains that the government was under no obligation to keep the center intact and functioning pursuant to its agreement with Carmichael as set forth in the order of forfeiture for the center. Moreover, Carmichael never raised a complaint about these actions when they occurred.

appraisal, conducted at the request of the bank that will provide financing to the prospective purchaser, valued the property at only $ 1.8 million.

Moreover, it is clear that it is in Carmichael's best financial interest for the sale to go forward as quickly as possible. The property continues to lose value as it stands unoccupied, debt secured by the property continues to accrue interest, and the government continues to incur maintenance costs that to date equal $ 39,000.00.

Nor can Carmichael prevail if the court construes his complaint about the sale price as alleging a breach of the settlement agreement, rather than asserting a continuing interest in the forfeited property. Nothing in the forfeiture record before the court makes any mention of an agreed-upon sale price for the center. The proposed sale of the center for $ 1.7 million does not impinge on any provision of any forfeiture order memorializing the parties' oral agreement; indeed, the evidence reflects that the government has engaged in only

good faith and arms-length negotiations for the sale of the center and that the proposed sale price is reasonable.

## 2. Payment of Creditors

Carmichael's second argument with respect to the center is that the government originally agreed to use proceeds from the sale of the property to pay all creditors, secured and unsecured, who contributed to the construction of the center. Carmichael alleges that the government has breached its agreement because it does not now intend to pay his unsecured creditors, exposing him to further civil liability for those debts.

Again, as a factual matter, it is unclear why preventing the sale of the property will benefit Carmichael in repaying his creditors even if his conviction is overturned, since he does not dispute that the property's value continues to deteriorate even as debt secured by the property continues to accrue

interest. Nor is there any merit to the claim that the government has breached its agreement.

The order of forfeiture for the Carmichael Center, entered with the consent of all parties, expressly provides that any third-party interests in the center are to be adjudicated pursuant to the procedures set forth in 21 U.S.C. 863(n).[10] Under § 853(n), legal interest in property may come about in only two ways: under subsection (n)(6)(A) to § 853, the petitioner must show that it had a superior interest in the property at the time of the acts giving rise to forfeiture; or, under subsection (n)(6)(B) to § 853, it must show that it was a bona fide purchaser for value without reason to know that the property was subject to forfeiture. United

---

10. The second preliminary order of forfeiture (Doc. No. 503), paragraph 6 reads, in relevant part: "Any person, other than the above named defendant, asserting a legal interest in the Carmichael Center ... may ... petition the court for a hearing ... and for an amendment of the order of forfeiture pursuant to Title 21, United States Code, Section 853(n)(6)."

10

States v. Carmichael, ___ F.Supp.2d ___, ___, 2006 WL 1549647 at *2 (M.D. Ala. 2006) (Thompson, J.).

It is clear that an unsecured creditor has no specific interest in property whatsoever, much less an interest that could be validated under subsection (n)(6)(A). It is equally clear that, according to the Eleventh Circuit Court of Appeals, unsecured creditors cannot be considered bona fide purchasers under subsection (n)(6)(B) because "their interest lies against the debtor personally as opposed to any specific property." United States v. Watkins, 320 F.3d 1279, 1284 (11th Cir. 2003).

It is therefore apparent from the face of the order for the forfeiture of the center that Carmichael did not negotiate for the government to pay debt owed by Carmichael to unsecured creditors from the sale of the property. This conclusion is confirmed by the court's order permitting the interlocutory sale of the property, an order which the government submitted to the court for

entry with Carmichael's consent.[11]  At paragraph four of that order, the court explicitly stated that, "Upon sale and closing of the real property described in the second preliminary order of forfeiture [that is, the Carmichael Center], the United States Marshals Service shall pay debt <u>secured</u> by said property, if such payment has been ordered by the court."[12]  Despite the clarity of this language, at no time, until now, has Carmichael claimed that he negotiated for debt owed unsecured creditors to be paid from the proceeds of the sale of the center.

Carmichael does not argue that the order of forfeiture for the center does in fact require the government to pay unsecured creditors, nor does he claim that the order is ambiguous.  Rather, he asserts that payment of unsecured creditors was a condition of his original agreement with the government made during oral negotiations, an assertion the government denies.  It is

---

11. Doc. No. 606.

12. <u>Id</u>. (emphasis added).

black letter law that the final memorialization of contractual agreements, including plea negotiations, "best informs the court of the agreements the parties have reached. ... Only where the language of the agreement is ambiguous, or where government overreaching is alleged does the court consider parole evidence." <u>Raulerson v. United States</u>, 901 F.2d 1009, 1012 (11th Cir. 1990).

The plain language of the order of forfeiture for the Carmichael Center (entered with the approval of all parties), buttressed by the even plainer language of the court's order approving interlocutory sale (also entered with the approval of all parties), establishes that the parties did not agree on the payment of unsecured creditors from the sale of the center. Nor would consideration of parole evidence, if appropriate, change the court's conclusion. The transcript of the parties' agreement as announced orally to the court makes no

mention of the payment of creditors.[13]  One of Carmichael's attorneys testified during the hearing on his stay motions that no discussion occurred distinguishing secured from unsecured creditors during the forfeiture-settlement negotiations.  While Carmichael may have assumed that unsecured creditors would be paid, this assumption was not made part of the oral record, nor was it recorded in the written memorializations of the agreement.  It is apparent from all the evidence before the court that Carmichael simply did not negotiate for the payment of unsecured creditors.

---

13. Attachment to government's response to order (Doc. No. 697), transcript of 11th day of jury trial proceedings, volume XI of XI, pp. 4-14.  The transcript makes clear that the parties were aware of, and likely discussed, the existence of outstanding contracts on the center: "The question is there are a lot of factors here, including the fact that this is an ongoing business.  The Carmichael Center has outstanding contracts."  Id. at p. 7.  However, as noted, no agreement regarding unsecured creditors was made part of either the oral record or the written memorialization of the agreement in the form of the second preliminary order of forfeiture.

14

## B. Sale of the 370.93 Acres

Carmichael also challenges the sale of the 370.93 acres as below market price. Unlike the order of forfeiture for the Carmichael Center, the order of forfeiture for the 370.93 acres preserves Carmichael's right to receive notice of the proposed sale price of the 370.93 acres and to object to that sale price, which he has now done. This negotiated agreement reflects the reality that, even after forfeiture, Carmichael is directly impacted by the sale price of this property.

First, all proceeds from the sale over one million dollars are to be returned to Carmichael. Second, the government, if it recovers less than one million dollars from the sale, could in theory seek recovery of the full amount of the proceeds judgment from other property owned by Carmichael that is not specifically protected from forfeiture by the agreement; in other words, the government could, in theory, further "punish" Carmichael by selling the 370.93 acres below the market value. And,

15

in theory, regardless of the government's intentions, it has no incentive whatsoever to seek a price higher than one million dollars.

However, the evidence before the court reflects no attempt by the government to shortchange Carmichael or in any way to compromise his interests through the proposed sale. First, both the government and Carmichael agree that there is, to their knowledge, no other property from which the government could seek recovery of the proceeds judgment against Carmichael. This means that the government has every incentive to seek the highest possible sales price for the 370.93 acres up to one million dollars, since the proceeds of the sale of this property will constitute the government's only recovery.

Despite this incentive, the government listed the property at $ 699,900, reduced the price to $ 669,000, and negotiated a sale for $ 500,250. There is, quite simply, no reason for the government to accept this price unless it represents the highest offer. The fact that it

is, in fact, the highest offer was confirmed by the listing agent testifying under oath at the hearing on the stay motions.

The listing agent also testified that the marketing of the property included listing on three national commercial brokerage websites, listing in local sources including the Montgomery Advertiser and the Montgomery Association of Realtors, and personally contacting potential buyers such as the City of Montgomery, the State of Alabama, the neighboring Hyundai corporation plant, and various private entertainment concerns. Finally, the court notes that both the listing and selling agencies negotiating the sale of the properties receive a percentage commission based upon the total sale price;[14] these agencies, therefore, have an incentive to

---

14. Government's response to oral order (Doc. No. 720). This document sets forth the commission structure for both properties based on documents provided by Jimmie Ann Campbell, the listing agent who testified under oath during the June 12, 2006, hearing.

aggressively market the properties and seek the highest bidder.

The overwhelming and uncontested evidence before the court shows that the government had every incentive to seek the highest price for the property, and, in fact, negotiated a sale, in good faith and at arms length, for the highest bid. The court therefore finds that the sale price of the 370.93 acres is reasonable and that there no reason to sustain Carmichael's objection to the sale.

### III. CONCLUSION

For the foregoing reasons, the court finds that the government has not breached its forfeiture agreement with Carmichael with respect to the sale of the Carmichael Center, the payment of creditors from the sale of the Carmichael Center, or the sale of the 370.93 acres.

An appropriate judgment will be entered.

DONE, this the 15th day of June, 2006.

                                        /s/ Myron H. Thompson
                                    UNITED STATES DISTRICT JUDGE